IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CAPITAL HOSPICE,                          )
                                          )
      Plaintiff,                      )
                                          )
      v.                              )     Civil Action No. 1:23-cv-1741 (RDA/LRV)
                                          )
ROBERT F. KENNEDY, SECRETARY OF)
HEALTH AND HUMAN SERVICES,[1]             )
                                          )
      Defendant.                      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on cross-motions for summary judgment filed by the parties.[2] *See* Dkts. 18 ("Plaintiff's Motion"); 22 ("Defendant's Motion"). The Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions together with the Memoranda in Support (Dkts. 19; 23), the parties' Oppositions (Dkts. 25; 27), and the parties' Replies (Dkts. 27; 40), it is hereby ORDERED that Plaintiff's Motion for Summary Judgment is DENIED and it is further ORDERED that Defendant's Motion for Summary Judgment is GRANTED for the reasons that follow.

---

[1] This case was originally brought against Xavier Becerra. The current Secretary of the U.S. Department of Health and Human Services is automatically substituted as the correct party. Fed. R. Civ. P. 25(d).

[2] For ease of reference, Plaintiff Capital Hospice will be referred to as "Plaintiff" and Defendant Robert F. Kennedy, Secretary of the U.S. Department of Health and Human Services, will be referred to as "Defendant."

I. BACKGROUND

A. Statutory and Regulatory Framework

Before discussing the undisputed facts and procedural background particular to this case, it is helpful to have a discussion of the relevant statutory and regulatory framework. Medicare, a federally funded health insurance program for eligible aged and disabled persons, is established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act"). The Centers for Medicare and Medicaid Services ("CMS") administer the Medicare program on behalf of the Secretary of the Department of Health and Human Services ("HHS"). *See* 42 U.S.C. § 1395 *et seq*.

The instant action involves the Medicare Hospice Benefit, a benefit under Part A of the Medicare Act. *See* 42 U.S.C. §§ 1395c, 1395x(dd), 1395y(a)(1)(C); 42 C.F.R. § 418.3. The Medicare Hospice Benefit provides hospice care coverage for beneficiaries who are certified as "terminally ill." 42 C.F.R. § 418.20(b). "An individual is considered to be 'terminally ill' if the individual has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A); *see also* 42 C.F.R. § 418.3 (defining "terminally ill" as a medical prognosis that the individual's "life expectancy is 6 months or less if the illness runs its normal course"). By electing the Medicare hospice benefit, the beneficiary waives all rights to Medicare payments for curative treatment for their terminal illnesses. 42 C.F.R. § 418.24(g).

The Medicare Act prohibits payment for hospice services "which are not reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. § 1395y(a)(1)(C). Moreover, Medicare payments cannot be made unless the party seeking payment furnishes HHS with sufficient information to substantiate medical necessity. *See* 42 C.F.R. § 424.5(a)(6).

A regulation provides that hospice services are only covered if a physician has completed a "certification that the individual is terminally ill . . . as set forth in section § 418.22." 42 C.F.R. § 418.200.1. The patient's attending physician and the medical director of the hospice program providing care must each certify in writing that the individual is terminally ill at the beginning of the first 90-day benefit period. *See* 42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 418.22(c); 42 U.S.C. § 1395d(a)(4). A beneficiary can be recertified for a second 90-day period and for an unlimited number of 60-day periods thereafter, so long as the beneficiary remains "terminally ill" and therefore eligible for the hospice benefit. 42 U.S.C. § 1395d(a)(4). For subsequent 90- or 60-day periods, the medical director or physician member of the hospice program must "recertif[y] at the beginning of the period that the individual is terminally ill." 42 U.S.C. § 1395f(a)(7)(A)(ii).

The certification and recertification forms "must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less." 42 C.F.R. § 418.22(b)(3). Moreover, "[c]linical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification." 42 C.F.R. § 418.22(b)(2). As CMS has explained,

> there must be a basis for a certification. A hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of 6 months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare.

70 Fed. Reg. 70532, 70534-35 (Nov. 22, 2005). Medicare claims for hospice care services are only valid if they comply with all regulatory requirements for payment, including documentation of a face-to-face encounter, physician certification requirements, and sufficient proof that the services were medically necessary. 42 C.F.R. §§ 418.20, 418.22, 418.200, 418.301, 418.302.

3

Medicare benefit claims are processed by private contractors who are hired by the Secretary to perform various functions, including to review, approve, and pay Medicare claims submitted by health care providers in accordance with the Medicare Act and agency guidelines. *See* 42 U.S.C. § 1395kk; 42 U.S.C. §§ 1395f(i), 1395kk(a), 1395h(a). A Medicare contractor may issue a Local Coverage Determination ("LCD"), which is the contractor's determination of whether a particular item or service within the contractor's jurisdiction is covered. 42 U.S.C. § 1395ff(f)(2)(B). LCDs are guidelines that serve as "administrative and educational tools to assist providers in submitting correct claims for payment" as they "specify under what clinical circumstances an item or service is considered to be reasonable and necessary." Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Hum. Servs., Pub. 100-08, Medicare Program Integrity, Transmittal 608, ch. 13.1.3 (Aug. 14, 2015).

Medicare hospice claims are subject to post-payment review, audits, and recoupment procedures. 42 U.S.C. § 1395ddd. A Medicare contractor can initiate a post-payment review to review an already-paid claim to determine whether the provider received an overpayment or an underpayment. 42 C.F.R. § 405.980. During post-payment review, the Medicare contractor verifies that the services provided were reasonable and medically necessary. *See* 42 U.S.C. §§ 1395ddd, 1395g(a), 1395y(a)(1)(C). If the Medicare contractor concludes that an overpayment was made, then HHS can seek to recoup the amount of the overpayment. 42 U.S.C. § 1395ddd(f)(2).

Following post-payment review, a hospice provider can appeal the Medicare contractor's denial of a Medicare claim through a four-part administrative appeal process. 42 U.S.C. § 1395ff; 42 C.F.R. §§ 405.900 to 1140. The appeals process consists of: (1) requesting a redetermination of the decision by the Medicare contractor who issued the denial, 42 U.S.C. § 1395ff(a)(3), (c);

4

(2) requesting reconsideration of the Medicare contractor's redetermination by a qualified independent contractor ("QIC"), 42 C.F.R. §§ 405.940, 405.960; (3) requesting a *de novo* hearing before an Administrative Law Judge ("ALJ"), 42 U.S.C. § 1395ff(d)(1); 42 C.F.R. § 405.1002; and (4) appealing any adverse ALJ decision to the HHS Departmental Appeals Board, Medicare Appeals Council (the "Council"), 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1100.  If the Council does not issue a decision within 180 days of receipt of the request for review, a provider may seek judicial review of the ALJ's decision in a United States District Court.   42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100, 405.1132, 405.1136.

### B.  Material Undisputed Facts

Before analyzing the Motions for Summary Judgment at issue, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact.  Fed. R. Civ. P. Rule 56.  To this end, Defendant set forth a statement of undisputed material facts that he contends are undisputed and supported by record citations as required by the Local Rules.  Dkt. 23 at 9-11; E.D. Va. L.R. 56(B) (requiring the moving party to list all material facts as to which there is no genuine issue and to cite to portions of the record).  Plaintiff likewise provided a statement of facts in its own Motion but did not specify whether it believes those facts to be undisputed.  Dkt. 19 at 2-14.  The Rules next require a nonmovant to respond to a movant's statement of undisputed facts by "listing all material facts to which it is contended that there exists a genuine dispute" with citations to the record.  L.R. 56(B).  In their respective Oppositions, neither party has listed material facts to which they assert exists a genuine dispute.  *See* Dkts. 25; 27.  Plaintiff does state, however, that it "does not dispute and adopts [Defendant]'s Statement of Undisputed Material Facts."  Dkt. 27 at 3-4.

The claims at issue here involve the denial of Medicare Hospice Benefits arising under the Medicare Act. Dkt. 1 ¶ 4. As both parties observe, this Court's review is confined to the administrative record of proceedings before the agency. 42 U.S.C. § 405(g); 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973). When a statute "confines judicial review of executive branch decisions to the administrative record of proceedings before the pertinent agency . . . there can be no genuine issue of material fact." *Shipbuilders Council of Am. v. DHS*, 770 F. Supp. 2d 793, 802 (E.D. Va. 2011). A particular "fact" is either reflected in the administrative record of agency proceedings or is not; and "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Accordingly, the following statement of facts is derived from a careful review of (i) Defendant's "Undisputed Material Facts," which have been adopted by Plaintiff, (ii) Plaintiff's "Statement of Facts," and (iii) the Administrative Record as a whole.[3]

The undisputed facts in this case are as follows:

1.      Plaintiff is a Medicare-certified company that provides hospice services in Virginia. Dkt. 1 ¶ 2.

2.      In July 2017, a Medicare contractor informed Plaintiff that it would be conducting a post-payment review of certain hospice claims. A.R. Vol I at 1625-36. In particular, the contractor requested that Plaintiff provide supporting documentation for 215 hospice claims for six patients billed under the Medicare Hospice Benefit between October 1, 2012, and May 31, 2017 – Patients R.C., T.T., H.N., P.E., W.B., and R.R. *Id.*

3.      In compliance with the request, Plaintiff provided the contractor with thousands of

---

[3] References to the Administrative Record will be cited as "A.R. Vol." followed by the specific volume and page number of the record citation.

pages of responsive medical records.  *Id.* at 426-792, 1651-3796, 4141-5114.

4.      On February 6, 2018, the contractor informed Plaintiff that 209 of the 215 claims

were subject to detailed review.  A.R. Vol. III at 588-594.  The contractor fully denied all 209

claims and asserted that there was an overpayment of $941,406.24.  *Id.* at 589, 591.  The contractor

explained the common issues causing the denials:

> [A]ll reviewed beneficiaries had extended lengths of stay and multiple re-
> admissions. None of the 6 reviewed beneficiaries expired on hospice services.
> Often, the terminal diagnosis was changed with each beneficiary multiple times.
> The documentation with each beneficiary painted a picture of a chronic condition,
> rather than an acute terminal illness. There was no terminal decline throughout the
> hospice length of stay with each beneficiary. In addition, there were no additional
> records from the beneficiary's attending physician such as progress notes, hospital
> notes, lab results, or any type of scans prior to the admission to hospice to support
> the justification to hospice care.

*Id.* at 1220-21.

5.      Following Plaintiff's request for redetermination, on June 1, 2018, the contractor

issued a partially favorable redetermination decision, approving seven of the 209 appealed claims

and requesting a return of the overpayment.  A.R. Vol. II at 4553-5071.

6.      Plaintiff then requested reconsideration of the remaining 202 denied claims by the

QIC.  On October 8, 2018, the QIC issued an unfavorable decision and found Plaintiff financially

liable for the non-covered hospice services.  A.R. Vol. I at 3805-39.

7.      On November 29, 2018, Plaintiff requested an ALJ hearing concerning the 202

denied claims of the six beneficiaries.  A.R. Vol I at 366-413.

8.      The hearing took place before ALJ Martin J. O'Connell on June 21, 2022.  *Id.* at

250-51; A.R. Vol. III at 5988-6156 ("ALJ Transcript").  During the hearing, the ALJ heard

argument from Plaintiff's counsel and testimony from Dr. Matthew Kestenbaum, Plaintiff's Chief

Medical Officer, and Dr. Ray Jay Garcia, Plaintiff's Medical Director (the "Doctors").  A.R. Vol.

I at 251; A.R. Vol. III at 5990 (index of witnesses). The Doctors asserted that the medical records supported the certifications of terminal illness for each patient. ALJ Transcript at 6-168. The Doctors' opinions were based upon their review of the medical records; however, the beneficiaries' treating physicians did not testify. ALJ Transcript at 20, 23; A.R. Vol. III at 5990. CMS exercised its right not to appear at the hearing. A.R. Vol. III at 5990; 42 C.F.R. § 405.1010(a).

9.    Following the hearing, the ALJ issued a 41-page decision (the "ALJ Decision") that analyzed the medical records, certifications, and testimony regarding the relevant certification periods for each beneficiary. *See* A.R. Vol. I at 250-90. The ALJ issued findings, concluding: (1) that beneficiary P.E.'s claims were fully covered;[4] (2) that beneficiaries W.B., R.C., and T.T.'s claims were not covered; and (3) that certain periods of service for beneficiaries H.N. and R.R. were covered, while other periods of service were not. *See id.* at 289. In sum, of the 202 claims on appeal to the ALJ, the ALJ approved coverage for 51 claims and denied coverage for 151 claims. *See id.* at 250-90. He also found that Plaintiff was financially liable for the charges not covered by Medicare and for the overpayment amounts. *Id.* at 90.

10.    On March 31, 2023, Plaintiff submitted a Request for Review of ALJ Medicare Decision to the Council. *Id.* at 144-244.

11.    The Council did not issue a final decision, dismissal order, or remand the case to the ALJ within 90 calendar days of receipt of the request for review. *See* 42 C.F.R. § 405.1100(c). Thus, on July 14, 2023, Plaintiff requested escalation of its appeal to federal district court as permitted by 42 C.F.R. § 405.1132(a). A.R. Vol. I at 5-117. The Council granted Plaintiff's request for escalation on October 19, 2023. *Id.* at 1-4.

12.    On December 18, 2023, Plaintiff filed the instant lawsuit seeking review of the ALJ

---

[4] As such, P.E.'s claims are not at issue in this appeal.

Decision.  Dkt. 1.

C.   Procedural Background

On December 18, 2023, Plaintiff filed its Complaint seeking judicial review of the decision rendered by the ALJ.  Dkt. 1 ¶ 1.  On March 4, 2024, Magistrate Judge Lindsey R. Vaala granted a consent motion for extension of time, allowing Defendant to respond to the Complaint on or before April 19, 2024.  Dkt. 10.  On April 4, 2024, the parties filed a joint motion for a briefing schedule for dispositive briefing.  Dkt. 12.  That same day, the Court adopted the parties' suggested schedule for the filing of the Administrative Record and dispositive motions.  Dkt. 13.

On April 18, 2024, Defendant filed his Answer to the Complaint and a consent motion regarding the submission of the administrative record.  Dkts. 14; 15.  The consent motion stated that the "certified administrative record in this case is more than 16,000 pages long and about 700 megabytes in size" and that "[f]iling the record on the Court's docket would require two dozen docket entries."  Dkt. 14 ¶ 4.  As such, Defendant sought leave to provide the administrative record to Plaintiff via USAfx, a filing sharing system, and to confer with Plaintiff regarding a plan to provide the administrative record to the Court.  *Id.* ¶ 5.  On May 23, 2024, Plaintiff filed a consent motion to extend the page limit for the parties' dispositive briefing.  Dkt. 17.

On May 24, 2024, Plaintiff filed its Motion for Summary Judgment and accompanying memorandum in support.[5]  Dkts. 18; 19.  On June 20, 2024, Plaintiff filed a consent motion to extend the remaining deadlines in the briefing schedule by one business day.  Dkt. 20.  On June 21, 2024, Defendant filed his Motion for Summary Judgment, an accompanying memorandum in

---

[5] Plaintiff styles its Motion as a "Dispositive Motion on its Complaint for Judicial Review." However, the Motion relies on evidence submitted apart from its Complaint and as part of the certified administrative record in this case, the Court will therefore construe Plaintiff's Motion as one for summary judgment.

support, and an opposition to Plaintiff's Motion for Summary Judgment. Dkts. 22; 23; 25.[6] On June 26, 2024, this Court granted the parties' pending consent motions. Dkt. 26. On July 8, 2024, Plaintiff filed, in one document, its opposition to Defendant's Motion for Summary Judgment and its reply in support of its own Motion for Summary Judgment. Dkt. 27. On July 9, 2024, Defendant filed a consent motion to file the certified administrative record manually and under seal. Dkts. 28; 29. On July 10, 2024, the Court granted Defendant's consent motion, allowing Defendant to submit the certified administrative record to the Court via thumb drive. Dkt. 32. Defendant delivered a thumb drive containing a copy of the certified administrative record to this Court on July 11, 2024. Dkt. 33. On July 11, 2024, Defendant filed its reply in support of its Motion for Summary Judgment. Dkt. 34. On August 9, 2024, Plaintiff submitted an Appendix containing the portions of the administrative record relied upon by the parties. Dkt. 37. On August 27, 2024, Defendant filed its amended reply in support of its Motion for Summary Judgment after receiving leave to do so. Dkts. 39; 40.

## II. LEGAL STANDARD

A. Judicial Review under the Medicare Act and the Administrative Procedure Act

The standards that govern this Court's review of the ALJ Decision are set out in the Medicare Act, 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.

The Medicare Act provides that the ALJ's factual findings must be upheld "if supported by substantial evidence." 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A); *Almy v. Sebelius*, 679 F.3d 297,

---

[6] Although the Memorandum in Support and Opposition to Plaintiff's Motion were filed as separate docket entries, each file is identical. *See* Dkts. 23; 25 ("Defendant's Memorandum in Support of His Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment").

301-02 (4th Cir. 2012).  Thus, the scope of judicial review of the ALJ Decision is limited to whether the findings of the ALJ are supported by substantial evidence and whether the ALJ reached his conclusions through application of the correct legal standard.  *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001).

Courts reviewing ALJ decisions (in a variety of contexts), recognize that substantial evidence is "more than a mere scintilla of evidence but may be less than a preponderance." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (citation omitted).  As the Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023).  The district court may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see Jarvis v. Berryhill*, 697 F. App'x 251, 252 (4th Cir. 2017) ("The duty to resolve conflicts in the evidence rests with the [agency], not with a reviewing court.").  "In undertaking this review, this Court considers whether the ALJ examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence." *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023).

The APA authorizes judicial review of "final agency action[s] for which there is no other adequate remedy."  5 U.S.C. § 704.  A district court must set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177,

192 (4th Cir. 2009).  To determine whether an agency action is arbitrary or capricious, a court examines whether the agency considered relevant factors and whether the decision is the result of a clear error of agency judgment.  *Id.*  A court's review of a final agency decision for clear error of judgment is limited to (1) asking whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" and (2) determining whether there exists a "rational connection between the facts found and the choice made."  *Armah-El-Aziz v. Zanotti*, 2015 WL 4394576, at *6 (E.D. Va. July 16, 2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "In practice, an action will not be considered arbitrary and capricious so long as the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made."  *Almy*, 679 F.3d at 302 (internal quotation marks and citations omitted).  A court conducts such a review "based on the full administrative record" that was before the agency at the time of the decision.  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

### B. Summary Judgment

Summary judgment is appropriate where a court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex v. Catrett*, 477 U.S. 317, 330 (1986).  "Because all the facts are set forth in the Certified Administrative Record when a case is brought under the Medicare Act and the APA, there are no factual disputes to resolve, and the entire case is a question of law."  *Vein & Wellness Grp., LLC v. Becerra*, 2022 WL 9361896, at *4 (D. Md. Oct. 14, 2022), *aff'd*, 2024 WL 3064713 (4th Cir. June 20, 2024); *see also Hyatt v. U.S. Pat. and Trademark Off.*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (explaining that "review is limited to the administrative record and resolution does not

require fact finding on behalf of [the] court. . . .  [S]ummary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA").

## III.  ANALYSIS

The parties have filed cross motions for summary judgment.  Plaintiff moves this Court to grant summary judgment in its favor and against Defendant, reversing the coverage denial of the remaining 151 claims at issue and awarding Plaintiff payment for the services it provided to the patients.  Dkt. 18.  Defendant opposes Plaintiff's motion and seeks summary judgment in his favor. *See generally* Dkt. 23.  Resolution of these cross motions for summary judgment raises two main issues for review: (1) whether the ALJ Decision is supported by substantial evidence and (2) whether the ALJ reached his decision through the application of the correct legal standards.  The Court will address these issues in turn.[7]

## A. The ALJ Decision is Supported by Substantial Evidence

The parties disagree whether the ALJ Decision regarding Patients W.B., R.C., T.T., H.N., and R.R. is supported by substantial evidence.  Plaintiff argues that the ALJ Decision "not only lacks the support of substantial evidence, [but] goes against the overwhelming weight of evidence." Dkt. 19 at 15-16.  Specifically, Plaintiff asserts that the medical records supported a terminal diagnosis for each patient and that the ALJ improperly "substituted his own unqualified clinical determinations for those of the physicians." *Id.*  Defendant contends that the medical records support the ALJ Decision, that the ALJ considered all key evidence in the record, and that the ALJ did not act as a medical expert.  Dkt. 23 at 12-25.

---

[7] Plaintiff did not separately make any arguments under the APA, other than a conclusory argument that the ALJ Decision was "arbitrary and capricious." Dkt. 19 at 30.  Accordingly, Plaintiff's APA claim rises and falls with its arguments under the Medicare Act.

The primary issue before the ALJ was whether the criteria for Medicare coverage was satisfied for each patient during the relevant hospice service periods. A.R. Vol. I at 251. That is, whether the evidence supported a medical prognosis of a life expectancy of six months or less during the relevant time periods, if the patient's illness ran its normal course. 42 C.F.R. § 418.20(b); 42 C.F.R. § 418.3; *see also* 42 C.F.R. § 424.5(a)(6) (requiring that "[t]he provider . . . must furnish to the intermediary or carrier sufficient information to determine whether payment is due"). LCDs assist in making this determination as they "specify under what clinical circumstances an item or service is considered to be reasonable and necessary." Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Hum. Servs., Pub. 100-08, Medicare Program Integrity, Transmittal 608, ch. 13.1.3 (Aug. 14, 2015). Although ALJs are not bound by LCDs, they "will give substantial deference to [LCDs] if they are applicable to a particular case." 42 C.F.R. § 405.1062(a).

The applicable LCD in this case is L34538 ("Hospice – Determining Terminal Status"), which sets forth the clinical diagnoses, statuses, signs, symptoms, and characteristics that indicate a terminal prognosis. A.R. Vol. I at 253; A.R. Vol. III at 5402-18. LCD L34538 provides two types of guidelines for evaluating a terminal prognosis: (1) "decline in clinical status guidelines," which are guidelines for general decline, A.R. Vol. III at 5406-08, and (2) "disease specific guidelines," which are guidelines specific to certain diseases such as cancer, dementia, and heart disease, *id.* at 5411-16. The decline in clinical status guidelines are divided into three parts. *Id.* at 5408. Part I lists signs and symptoms of decline that "predict longevity of six months or less," Part II lists "non-disease specific baseline guidelines" such as whether a patient depends on assistance for two or more activities of daily living, and Part III lists comorbidities that should be considered in determining eligibility. *Id.* at 5406-08. Ultimately, "[a] patient will be considered

to have a life expectancy of six months or less if he/she meets the . . . decline in clinical status guidelines described in Part I" or, alternatively, if the patient meets the non-disease specific baseline guidelines described in Part II *and* "the applicable disease-specific guidelines." *Id.* at 5406. Documentation provided "should 'paint a picture' for the reviewer to clearly see why the patient is appropriate for hospice care." *Id.* at 5410. Thus, "[t]he records should include observations and data, not merely conclusions" and "[i]f the documentation includes any findings inconsistent with or tending to disprove a less than 6-month prognosis, they should be answered or refuted by other entries, or specifically addressed and explained." *Id.* Most relevant here, the LCD also explains that

> The condition of some patients receiving hospice care may stabilize or improve during or due to that care, with the expectation that the stabilization or improvement will not be brief and temporary. In such circumstances, if the patient's condition changes such that he or she no longer has a prognosis of life expectancy of six months or less, and that improvement can be expected to continue outside the hospice setting, then that patient should be discharged from hospice.

*Id.* at 5407.

In a comprehensive decision, the ALJ set out the applicable law and policy, his general findings of fact and analysis, his findings of fact and analysis for each individual patient, and his conclusions of law as to each patient. A.R. Vol. I at 251-90. In the general findings section, the ALJ acknowledged that "[b]ased upon the testimony of the witnesses and the admission diagnoses and conditions of most patients . . . , the evidence *appears* to support a terminal diagnosis or diagnoses" and that "[t]he selection for review may have been influenced by the unexpected longevity of the patients; most of them outlived their 6-month terminal prognosis – repeatedly." A.R. Vol. I at 255 (emphasis added). Addressing the patients individually, however, the ALJ observed that, in reality, there was insufficient persuasive documentation to establish that the patients met the criteria for Medicare coverage for the majority of the hospice service periods at

issue because their conditions had stabilized.  *Id.* at 258, 265, 277, 283, 287-88.  In reviewing the evidence before him, the ALJ considered each patient individually and did not rule wholly in favor of Plaintiff or Defendant.   Rather, the ALJ engaged in a thorough analysis and ultimately concluded: (1) that beneficiary P.E.'s claims were fully covered; (2) that beneficiaries W.B., R.C., and T.T.'s claims were not covered; and (3) that certain periods of service for beneficiaries H.N. and R.R. were covered, while other periods of service were not.  *Id.* at 289.

The ALJ's conclusions as to each patient were supported by substantial evidence; that is, "more than a mere scintilla of evidence but . . . less than a preponderance."  *Pearson*, 810 F.3d at 207.  The ALJ concluded that Patient W.B. did not meet the criteria for Medicare coverage for three periods of hospice service: November 17, 2015 to March 8, 2016; May 11, 2016 to August 31, 2016; and November 1, 2016 to February 28, 2017.  A.R. Vol. I. at 256-59.  W.B. was certified for hospice with a terminal diagnosis of heart failure, along with the coexisting diagnosis of human immunodeficiency virus ("HIV").  *Id.* at 256; A.R. Vol. III at 80.  The ALJ found that "[t]he medical records for hospice visits paint a picture that is inconsistent with terminal prognosis showing a decline or adverse changes in [W.B.]'s conditions" and that "the certifications for his hospice episodes suggest a far more serious condition and course of illness and medical needs than is shown in the visit records.  There are no reported changes, declines in his condition or adverse findings in the nursing or aide records."  A.R. Vol. I at 258.  The ALJ's analysis of W.B.'s medical records revealed that W.B.'s "health status was largely unchanged" during his hospice periods.  *Id.* at 258.  For instance, during W.B.'s first hospice episode,

> Personal hygiene and nutrition activities were often not performed by the CNA; he did not complain of pain and had no wounds; he was able to ambulate with an assistive device.  His weight showed a slight decline of .4 lbs. from November to the end of January.

16

*Id.* The ALJ further observed that the medical records for the subsequent hospice periods were similar in that they showed no material decline in W.B.'s condition or health status. *Id.* As such, the ALJ concluded that there was insufficient persuasive documentation to support Medicare coverage during the three service periods in question.

The ALJ next concluded that Patient R.C. did not meet the criteria for Medicare coverage for a nearly four-year period of hospice service: July 1, 2013 to May 31, 2017. *Id.* at 260-66. R.C. was certified for hospice care with a terminal diagnosis of senile dementia, along with the coexisting diagnoses of heart failure and diabetes mellitus. *Id.* at 260-61; *id.* at 1656. Upon review of the approximately 2,500 pages that make up R.C.'s medical records, the ALJ found that R.C.'s records "paint[] a picture of a patient with multiple chronic and recurring medical problems, severe limitations in terms of mobility, awareness, communications and ability to perform activities of daily living," *id.* at 265. As such, the ALJ observed that "[t]here is no doubt that [R.C.]'s conditions required total care that included palliative care that is frequently associated with hospice." *Id.* Nevertheless, the ALJ found that

> the evidence also tends to support a relatively stable condition that remained largely unchanged over the dates of service at issue. There does not appear to have been any health status changes with respect to his cardiovascular and respiratory systems. There were no specific clinical needs identified that were included in his care plan with respect to these systems. [R.C.]'s performance scale scores . . . remained unchanged. . . . His [assistance with daily living] limitations were unchanged.

*Id.* at 266. Thus, in line with LCD L34538, which counsels that patients should be discharged from hospice when their condition stabilizes, A.R. Vol. III at 5407, the ALJ concluded that there was insufficient persuasive evidence to establish that he met the criteria for Medicare coverage and payment for hospice care during the four-year period of hospice service, A.R. Vol. I at 266.

The ALJ issued a decision that was partially favorable to Plaintiff with respect to Patient H.N., concluding that H.N. did meet the criteria for Medicare coverage for hospice services provided between July 1, 2013, and June 30, 2014, but did not meet the criteria for coverage for the following dates of service: July 1, 2015 to March 21, 2015, April 20, 2016 to June 3, 2016, July 29, 2016 to September 12, 2016, September 27, 2016 to November 21, 2016, and December 22, 2016 to March 20, 2017, March 29, 2017 to April 27, 2017, and May 9, 2017 to May 20, 2017. *Id.* at 272-77.   H.N. was initially certified for hospice care with a terminal diagnosis of cerebrovascular disease and advanced prostate cancer.  *Id.* at 272; A.R. Vol. II at 2387.  H.N. developed a number of comorbidities, including encephalopathy, quadriplegia, respiratory failure on ventilator, and diabetes mellitus.  A.R. Vol I. at 272.  The ALJ found that H.N.'s records showed that he "was repeatedly discharged from hospice to seek aggressive treatment only to be subsequently admitted to hospice care again."  *Id.*  H.N., however, "was unresponsive, bedbound, and needed total care for all [activities of daily living]."  *Id.*  Thus, the ALJ concluded that, "[u]pon review of the record and [H.N.]'s multiple conditions and comorbidities, the hospice services provided to [H.N.] during the earlier dates of service [between July 1, 2013 and June 30, 2014] are found to be reasonable and necessary and that [H.N.] had a life expectancy of six or fewer months." *Id.* at 277.  With respect to H.N.'s remaining date of service, however, the ALJ found that

> the records are repetitive and insufficiently persuasive to establish that [H.N.] had a terminal prognosis.  The hospice personnel were sufficiently familiar with [H.N.] at this time to recognize his long-term status was generally unchanged and there was no further evidence of imminent or predictable decline in his condition. Moreover, given the history of revocations, it is difficult to conclude that hospice care was the most appropriate long-term medical setting for [H.N.]."

*Id.*  Thus, given H.N.'s stabilized condition and his lack of decline, the ALJ concluded that H.N. did not meet the criteria for eligibility for Medicare coverage and payment for dates of hospice service between July 1, 2014 and May 20, 2017.  *Id.*

The ALJ also issued a decision that was partially favorable to Plaintiff with respect to Patient R.R., concluding that R.R. did meet the criteria for Medicare coverage for hospice services provided November 25, 2013 to December 31, 2013, but did not meet the criteria for coverage for hospice services provided January 1, 2014 to May 31, 2017.  *Id.* at 278-84.[8]  On November 25, 2013, R.R. was certified for hospice services with a terminal diagnosis of senile dementia.  *Id.* at 278; A.R. Vol. III at 3801.  The ALJ found that R.R.'s medical records demonstrated that R.R. "met functional/structural impairments, as [R.R.] was totally bedbound, unable to do any activity and dependent for all [activities of daily living]." A.R. Vol I at 283.  The records also showed that R.R. was cachectic, had diminished lung sounds, and had extremity contractures, and that R.R.'s palliative performance scale and functional assessment staging scores met the requirements for Medicare hospice eligibility.  *Id.*  Thus, the ALJ concluded that the criteria for Medicare coverage and payment for hospice care was satisfied for the care provided November 25, 2013 to December 31, 2013.  *Id.*  For the hospice services provided January 1, 2014 to May 31, 2017, the ALJ found that

> the records are repetitive and insufficiently persuasive to establish that [R.R.] had a terminal prognosis.  The hospice personnel were sufficiently familiar with [R.R.] at this time to recognize her long-term status was generally unchanged and there was no further evidence of imminent or predictable decline in [her] condition. Moreover, given her history of revocation for travel, the absence of a certification for 2014, the persistent state of her health, there is insufficient basis to find that she continued to have terminal prognosis that satisfied the requirements for Medicare coverage and payment for hospice care.

*Id.*  Accordingly, in line with LCD L34538's guidance that stabilization of a patient's condition should result in discharge, the ALJ concluded that there was insufficient persuasive evidence to

---

[8] Patient R.R. initially had a terminal diagnosis of adult failure to thrive identified on November 26, 2012.  *Id.* at 278.  R.R. was discharged from hospice care on November 4, 2013, when she traveled to India.  *Id.*  She once again consented to hospice services on November 25, 2013.  *Id.*

establish that R.R. met the criteria for Medicare coverage during her three-year hospice period of January 1, 2014 to May 31, 2017. *Id.* at 283-84.[9]

      The ALJ concluded that Patient T.T. did not meet the criteria for Medicare coverage for a two-year period of hospice service: September 26, 2013 to December 31, 2015. *Id.* at 285-88. T.T. was certified with a terminal diagnosis of other degenerative diseases of the basal ganglia and progressive supranuclear palsy, along with the comorbidities of hypertension, prostate cancer, papilledema, optic neuritis, and chronic obstructive pulmonary disease. *Id.*; A.R. Vol. II at 2951. Upon review of the approximately 1,500 pages of T.T.'s medical records, the ALJ found that the records "paint[] a picture of a patient with an untreatable neurogenic condition, multiple chronic conditions (COPD, hypertension, neuritis) and limitations in terms of mobility and ability to perform activities of daily living." A.R. Vol. I at 287-88. However, the ALJ found that Patient T.T.'s condition remained stable during the two-year period of hospice service.

> The Plan[s] of Care remain mostly unchanged throughout the dates of service. . . . The IDT Progress Report(s) are also mostly unchanged through March 2016. . . . The Aide visits and 'Tele-Caring' reports are also similar in content with no reports of material changes in [T.T.]'s conditions or care. . . . The evidence tends to support a relatively stable condition that remained largely unchanged over the dates of service at issue. There does not appear to have been any health status changes with respect to his palsy. There were no specific clinical needs identified that were included in his care plan with respect to these systems.

---

[9] With respect to R.R., the ALJ also found that the record did not include recertification documentation for 2014. A.R. Vol I at 283. As Plaintiff correctly notes, the recertification documentation is included in the Administrative Record. Dkt. 19 at 23; A.R. Vol. III at 5428-32. Nonetheless, this does not undermine the ALJ Decision with respect to R.R., because the ALJ considered numerous medical records with respect to R.R. as well as the testimony at the hearing. A.R. Vol. I at 278-84. Moreover, Plaintiff does not cite any specific information with respect to R.R. that the ALJ should have considered and did not. Dkts. 19, 27 at 12-13 (asserting generally that Plaintiff "cited numerous specific events and evidence demonstrating the patient's limited life expectancy" but failing to discuss or identify any of them).

*Id.* (internal citations omitted).  Again, in line with LCD L34538's guidance that stabilization of a patient's condition should result in discharge, the ALJ concluded that there was insufficient persuasive evidence to establish that T.T. met the criteria for Medicare coverage.  *Id.*

Ultimately, as shown *supra*, the evidence that the ALJ relied upon with respect to Patients W.B., R.C., H.N., R.R., and T.T. is "such evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion" that these patients did not meet the eligibility criteria during the service periods in question.  *Pierce*, 487 U.S. at 565 (quoting *Consol. Edison Co. of N.Y.*, 305 U.S. at 229).  The ALJ Decision is therefore supported by "the low bar of substantial evidence," and must be upheld.  *Encompass Health Rehab. Hosp. of Charleston, LLC v. Becerra*, 2024 WL 3833197, at *11 (D.S.C. Aug. 15, 2024); *see also Ramaco Res., LLC v. Fed. Ins. Co.*, 74 F.4th 255 (4th Cir. 2023) (explaining that "[s]ubstantial evidence is a low bar").  Further, the ALJ "examined the relevant data" from the administrative record "and provided an explanation of [his] decision that includes a rational connection between the facts found and the choice made."  *Almy*, 679 F.3d at 302 (internal quotation marks and citations omitted).  More specifically, the ALJ demonstrated that the medical records for the patients with denied claims did not support their respective certifications of terminal diagnosis because their conditions had stabilized for long periods of time.  Thus, the ALJ Decision was not arbitrary and capricious and must receive deference.  *Id.*

To avoid this outcome, Plaintiff argues that the ALJ improperly discredited the medical opinion testimony from the hearing and acted as a medical expert by substituting his opinion for those of hospice physicians.  Dkt. 19 at 15-23.  Specifically, Plaintiff contends that ten different physicians signed certifications of terminal illness for the patients in question, and argues that physician certifications have great weight if there is no conflicting evidence.  *Id.* at 16 (citing *Ridgely v. Sec'y of Dep't of Health, Ed. & Welfare*, 345 F. Supp. 983 (D. Md. 1972), *aff'd sub*

*nom. Ridgely v. Sec'y of Dep't of Health, Ed. & Welfare of U. S.*, 475 F.2d 1222 (4th Cir. 1973). Plaintiff further asserts that its testifying Doctors opined that the patients were properly certified for hospice, and that there "is no contrary physician opinion evidence in the record to discount either the physician certifications or the Doctors' testimony," as neither CMS nor its contractors participated in the hearing or provided contrary medical opinion evidence. Dkt. 19 at 18. Plaintiff thus argues that the ALJ improperly supplied his own layperson judgment and "cherry picked" facts to conclude that the patients did not have a terminal prognosis. *Id.* at 19-20. Defendant counters that, while certifications are a necessary condition for Medicare coverage, certifications are not sufficient and must be corroborated by objective medical evidence. Dkt. 23 at 20. Defendant thus argues that the ALJ correctly analyzed whether the certifications were supported by objective documentation. *Id.* This Court agrees.

The ALJ properly analyzed whether the certifications were supported by the patients' medical records because "[c]linical information and other documentation that support the medical prognosis must accompany [a] certification." 42 C.F.R. § 418.22(b)(2); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (holding that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). As CMS has explained, "there must be a basis for a certification" and "the physician's clinical judgment [must] be supported by clinical information and other documentation that provide a basis for the certification of 6 months or less if the illness runs its normal course." 70 Fed. Reg. 70532, 70534-35 (Nov. 22, 2005). Here, the ALJ observed deficiencies and inconsistencies in the medical records of the patients whose claims were denied for the service dates in question and concluded that the objective medical records did not support the certifications of terminal prognosis because they painted pictures of patients with stabilized conditions for long

periods of time.  *See generally* A.R. Vol. I at 561-90.[10]  Moreover, the ALJ did not cherry pick evidence,[11] as he acknowledged evidence that supported a terminal prognosis as well as evidence that did not.  For instance, the ALJ observed that "[t]here was no doubt that [Patient R.C.]'s conditions required total care that included palliative care that is frequently associated with hospice," but ultimately concluded that R.C. did not meet the eligibility criteria for the dates of service in question because R.C. had "a relatively stable condition that remained largely unchanged over" the four-year period of hospice service.  *Id.* at 260-66.  The ALJ also concluded that the medical records of Patients P.E., H.N., and R.R. supported the certifications of terminal illness for some or all of their dates of hospice service and issued favorable determinations for Plaintiff in that regard.  *Id.* at 289.  The ALJ therefore properly determined whether the objective medical documentation provided corroborated the certifications of the hospice physicians and the testimony of Plaintiff's Doctors.

Accordingly, the ALJ Decision is supported by substantial evidence and must be upheld.

---

[10] Further, Plaintiff's assertion that the ALJ did not identify a basis to discredit the hospice physicians' conclusions or that the ALJ did not address the testimony of its Doctors is unpersuasive.  Dkt. 19 at 16-19.  The ALJ acknowledged both sets of evidence by stating that "[b]ased upon the testimony of the witnesses and the admission diagnoses and conditions of most patients . . . , the evidence *appears* to support a terminal diagnosis or diagnoses."  A.R. Vol. I at 255 (emphasis added).  Addressing the patients individually, however, the ALJ observed that, in reality, there is insufficient persuasive documentation to establish that the patients met the criteria for Medicare coverage for majority of the hospice service periods at issue primarily because of their stabilized conditions.  *Id.* at 258, 265, 277, 283, 287-88.

[11] Plaintiff attempts to fault the ALJ for "summariz[ing] excerpts from the medical records."  Dkt. 19 at 19.  The Court notes, however, that there are more than 16,000 pages in the administrative record, and Plaintiff cannot have reasonably expected the ALJ to recite each piece of evidence in the opinion.  *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (holding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").

23

B. The ALJ Applied the Correct Legal Standards

Plaintiff next argues that the ALJ failed (1) to afford substantial deference to the LCD guidelines when evaluating the eligibility of the patients and (2) to limit Plaintiff's liability pursuant to the Medicare limitation of liability provision. Dkt. 19 at 24-30. The Court will address these arguments in turn.

Plaintiff first contends that the ALJ failed to afford the LCD guidelines substantial deference because the ALJ cited the incorrect LCD guideline and because the ALJ did not explicitly discuss the LCD guidelines in his analysis of the individual patients. These arguments are without merit. First, while the ALJ does incorrectly cite to LCD L33393 instead of LCD L34538 in the "Applicable Law and Policy" section of the Decision, A.R. Vol I at 253-54 (explaining that "[t]he Medicare contractors also relied on a Local Coverage Determination, 'Hospice – Determining Terminal Status' L33393"), the citation appears to be a mere typographical error. The subsequent block quotes, as well as the title of the LCD, are directly from LCD L34538, the applicable LCD. *Compare* A.R. Vol. I at 253-54 *with* A.R. Vol. III at 5402-18. Thus, the ALJ properly relied on LCD 34538 despite the typographical error that suggests he did not. Second, the ALJ set forth the relevant guidelines from LCD 34538 in the "Applicable Law and Policy" section of the Decision and applied the guidelines to each patient. A.R. Vol. I at 253-54. Specifically, as the ALJ quoted in the "Applicable Law and Policy" section, LCD L34538 counsels that patients should be discharged from hospice if their condition stabilizes. *Id.*; A.R. Vol. III at 5407. In line with this guideline, the ALJ concluded that Patients W.B., R.C., H.N., R.R., and T.T. did not satisfy the criteria for Medicare coverage during the relevant hospice periods because their conditions had stabilized and remained unchanged for long periods of time. A.R. Vol. I at 240-91. Accordingly, the ALJ afforded substantial deference to the applicable LCD and

24

applied those guidelines in the analysis of whether each patient met the Medicare criteria for different periods of hospice service.

Plaintiff next argues that, even if it did not demonstrate the propriety of each appealed claim, it is still entitled to payment pursuant to the Medicare limitation of liability provision, Section 1879(g) of the Social Security Act, 42 U.S.C. § 1395pp. Dkt. 19 at 25. Plaintiff argues that the ALJ improperly applied this provision to deny Plaintiff's claims. *Id.* Pursuant to Section 1879(g), a provider's liability for overpayment of a denied claim will be limited if the provider "did not know, or could not reasonably have been expected to know," that a Medicare payment could not be made for such items or services. 42 U.S.C. § 1395pp(a). The limitation does not apply where "[i]t is clear that the provider . . . could have been expected to have known that the services were excluded from coverage on the basis of . . . [i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries." 42 C.F.R. § 411.406(e)(1).

Here, the ALJ identified the applicability of the Medicare limitation of liability provision as an issue to address, A.R. Vol. I at 251, and concluded that, "based on the undersigned's findings concerning the content of the medical records, . . . the provider is held to have knowledge of noncoverage." *Id.* at 289. Essentially, the ALJ concluded that given the noted deficiencies in the objective medical documentation that was submitted in support of certification for each patient, Plaintiff should have known that the hospice services provided during the relevant time periods were not covered due to the patients' stabilized conditions. *See id.* This is "such evidence as a reasonable mind might accept as adequate to support a conclusion" that the Medicare limitation of liability provision does not apply to limit Plaintiff's liability in this case, *Pierce*, 487 U.S. at 565, especially given the availability of the LCD guidelines as "administrative and educational tools to

assist providers in submitting correct claims for payment."  Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Hum. Servs., Pub. 100-08, Medicare Program Integrity, Transmittal 608, ch. 13.1.3 (Aug. 14, 2015).  Moreover, as courts of appeals recognize, review of a decision in this regard is "highly deferential."  *Maximum Comfort Inc. v. Sec'y of Heath & Human Servs.*, 512 F.3d 1081, 1088 (9th Cir. 2007).  It is clear from the record in this case, that Plaintiff and Plaintiff's Doctors were aware of the applicable LCD and aware that Medicare does not cover patients who remain in hospice for years with stable conditions.  This is precisely the circumstance at issue here. Thus, it should be of no surprise to Plaintiff that, when they submit claims for patients who spent years in hospice in stable conditions, those claims are denied.  *See MacKenzie Med. Supply, Inc. v. Leavitt*, 506 F.3d 341, 349 (4th Cir. 2007) (finding a provider was "on notice" regarding requirements and documentation needed and that the ALJ had the opportunity to judge the credibility of witnesses); *LivinRite, Inc. v. Azar*, 386 F. Supp. 3d 644, 665 (E.D. Va. 2019) ("[A]s courts have held, Medicare-certified providers can be expected to know that certain services are not covered by Medicare based on their 'constructive notice' of the criteria for coverage in the Medicare regulations and manuals." (citing cases)).  Accordingly, the ALJ properly concluded that the Medicare limitation of liability provision does not apply to these circumstances, and that Plaintiff is financially liable for the overpayment amounts identified.  A.R. Vol. I at 289-90.[12]

---

[12] As previously noted, Plaintiff did not separately make any arguments under the APA with respect to whether the ALJ applied the correct legal standards, other than a conclusory argument that the ALJ Decision was "arbitrary and capricious."  Dkt. 19 at 30.  Accordingly, Plaintiff's APA claim rises and falls with its arguments under the Medicare Act.  Because this Court has found that the ALJ's conclusion with respect to the Medicare limitation of liability provision is supported by substantial evidence, this Court also finds that the ALJ Decision was not arbitrary and capricious in this regard.

## IV.   CONCLUSION

In sum, the ALJ Decision is supported by substantial evidence with respect to each patient and the ALJ applied the correct legal standards in making his determination.  Accordingly, for the foregoing reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 22) is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Dkt. 18) is DENIED; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
March 31, 2025

_____ /s/
Rossie D. Alston, Jr.
United States District Judge

27